⬜ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

In re:                                              :

THOMAS A. DELIA,                                    :

                        Debtor/Appellee.            :

                                                    :

-----------------------------------------------------------

                                                    :

XSTRATA CANADA CORPORATION,                         :
f/k/a FALCONBRIDGE LIMITED,                         :

                        Plaintiff/Appellant,        :

                v.                                  :

                                                    :

THOMAS A. DELIA,                                    :
                        Defendant/Appellee.         :

-----------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED: _9/30/13_

**OPINION AND ORDER**

**12 Civ. 2851 (ER)**

Ramos, D.J.:

        Xstrata Canada Corporation, f/k/a Falconbridge Limited ("Xstrata" or "Appellant"),

appeals from the Memorandum Decision and Order of United States Bankruptcy Court for the

Southern District of New York, Judge Cecelia G. Morris, dismissing its adversary proceeding

against Appellee Thomas A. Delia ("Delia"). Doc. 1.[1] The proceeding below was an action to

except from discharge in Delia's personal bankruptcy a purported debt of his company,

Advanced Recycling Technology, Inc. ("ART"), to Xstrata. Bankr. Doc. 1 ("Complaint"). In

that proceeding, Xstrata claimed that Delia, in his role as President of ART, induced it to

purchase two thousand tons of a manufacturing waste by-product known as "slag"—a rock-like

substance containing various metals—for in excess of $1 million based on the fraudulent

representation that the material contained usable gold. Id. ¶¶ 5, 14. The bankruptcy court

---

[1] References to "Doc." refer to documents filed in the instant appeal. References to "Bankr. Doc." refer to
documents filed in the underlying adversary proceeding, Xstrata Canada Corporation v. Thomas A. Delia,
No. 10-09029 (CGM).

granted Delia's motion for summary judgment finding, *inter alia*, that Xstrata failed to establish (1) a basis for piercing the corporate veil, such that Delia could be held accountable for the debts of ART, and (2) that it justifiably relied on Delia's alleged fraudulent representations.  Bankr. Doc. 67 (the "Order").  For the reasons set forth below, the Order of the bankruptcy court dismissing the complaint is AFFIRMED.

**I.     Facts**

The following facts are undisputed, unless otherwise noted.

Appellant Xstrata, a company based in Canada, is in the business of mining, smelting and refining various metals, including precious metals.  Complaint ¶ 6.  ART is in the business of recycling industrial waste and by-product material.  *Id.* ¶ 7.

*The Gorham Slag*

The slag at issue in this case was created as a result of the manufacturing processes of the Gorham Manufacturing Company ("Gorham"), a producer of fine flatware, silverware, and other gold, silver and metallic objects from the 1800's to the 1960's at its facility in Providence, Rhode Island.  Bankr. Doc. 52 (Responses to Delia's Statement of Uncontested Material Facts and Xstrata's Additional Material Facts) ¶ 1.  Over the years, the slag was buried as landfill in the area immediately behind the facility.  *Id.* ¶ 2.  Approximately 2,000 tons—or 4,000,000 pounds—of slag was ultimately proven to have been buried at the Gorham facility.  Because the parties vigorously dispute the process by which the gold content of the slag was determined, some background into standard procedures in the industry is useful.

The accepted method of accurately determining the precious metal content of a piece of slag is a process called fire assay.  *Id.* ¶ 18.  Fire assay is a very old procedure, going back 2,000 years or so, which involves the use of a hot furnace and lead as an extracting agent to remove the

precious metals out of the material.  *Id.* ¶ 39.  In order to gain a meaningful evaluation of the potential precious metal content of a bulk volume of slag, one must secure a representative sample of the material, and then test that sample.  *Id.* ¶ 22.  In order to secure a representative sample of a large bulk pile of slag, it is necessary to secure a sampling that is large enough in volume, from diverse areas of the pile, while the pile is being stirred or moved, and is statistically random and not simply for one area of the pile.  *Id.* ¶ 24.  The Gorham slag was heterogeneous, meaning that no two pieces were the same, i.e., one piece could have a significantly different metallic makeup than another piece taken from the exact same area of the pile.  *Id.* ¶ 16.  Therefore, the parties agree that the Gorham slag required a sophisticated sampling technique whereby each individual piece of slag had at least the opportunity to be a part of the 'representative sample' randomly selected from the whole pile.  *Id.* ¶ 28.

### *Initial Testing of the 80-Pound Grab Sample of Slag*

On May 10, 2006, a company retained to remove the Gorham slag and the soil in which it was buried contacted ART to ascertain its interest in recycling the material.  *Id.* ¶ 6.  Xstrata asserts, and Delia denies, that prior to visiting the Gorham site, Delia received information concerning fire assays that had been conducted on two different samples of the Gorham slag which showed very little gold or silver content.  *Id.* ¶ 8; Complaint ¶ 17.  On May 22, 2006, Delia drove to the Gorham site to observe the slag pile.  Bankr. Doc. 52 ¶ 7.  While at the Gorham facility, Delia walked around the slag pile and placed approximately 80 pounds of the material into a bag or box.  *Id.* ¶ 8.  Delia asserts that he "randomly" selected the pieces of slag for his sample.  *Id.*  Xstrata, on the other hand, asserts that Delia, knowing that "the assay results showed an insufficient amount of silver and gold to be attractive to a recycler," Complaint ¶ 18,

used a hand-held X-ray device—of a type used for ascertaining the precious metal content of materials—to essentially cherry-pick the pieces with the highest gold content.  *Id.* ¶¶ 11, 17.

Delia then delivered approximately thirty-eight and one-half pounds of the initial 80 pound grab sample of slag to Abington Metals, a precious metal laboratory, to be milled into powder form so that a fire assay could be performed on the material.  Bankr. Doc. 52 ¶¶ 36-37. The powdered sample created by Abington was then sent by ART to Ledoux & Company ("Ledoux"), a metallurgical lab, to conduct a fire assay, as well as an X-ray scan.  *Id.* ¶¶ 37, 39.

On June 13, 2006, Delia on behalf of ART sent the Ledoux X-ray scan and assay results to Ian Parkinson, a sales representative for Xstrata, via email.  The email stated: "[p]lease find the assays for the metal slag we will be getting delivery of 2000 to 3000 tons of this material next week".  The fire assay Ledoux performed on the grab sample of heterogeneous slag showed the following precious metal content:  silver 0.054% (540 grams/metric ton); gold 0.012% (120 g/mt).  *Id.* ¶ 41-42.

That same day, Parkinson forwarded the ART email to Jay Hemenway, manager of the Xstrata Belledune smelter in New Brunswick, Nova Scotia, and requested that he perform a "Crystal Ball" financial and metallurgical analysis of the slag.  The next day, June 14, 2006, Parkinson sent Hemenway an email requesting that he prepare an outline of the terms of a prospective contract with ART.  *Id.* ¶¶ 44-45.

On June 14, 2006, Xstrata provided ART with an outline of the basic terms to be incorporated into a contract for the purchase and treatment of the slag. The email stated that Xstrata needs "a bit more information" to complete their evaluation.  The email also requested a representative sample of the slag.[2]  *Id.* ¶¶ 46-47.  On June 15, 2006, ART sent Xstrata a ten-

---

[2] In his deposition, Hemenway acknowledged that the 80 pounds of slag that Delia obtained by walking around the slag pile did not create a "representative sample."  Bankr. Doc. 46-9 (Hemenway Dep.) 297:19 – 298:3.

pound sample from the initial 80 pound grab lot containing two pieces of the Gorham slag by express mail delivery. *Id.* ¶ 49.

On June 22, 2006, the Xstrata laboratory performed an X-ray scan of the two pieces of slag, and the "fingerprint" of the minor elements (Iron, Magnesium, Sodium, Potassium, Silica, and Aluminum) were confirmed as consistent with the Ledoux results. *Id.* ¶ 50. However, an X-ray scan cannot identify the precious metal content of a piece of slag, and accordingly, on June 23, 2006, the Xstrata lab performed a so-called business evaluation fire assay of the first piece of sample slag to determine the gold and silver content. On June 27, 2006, the Xstrata laboratory advised Hemenway that the sample contained no payable gold, with a result of only 0.09 g/mt (approximately 1,330 times less gold than the amount reported in the Ledoux fire assay of 120 g/mt). *Id.* ¶ 51. On July 3, 2006, the Xstrata lab performed a business evaluation fire assay of the second piece of sample slag provided by ART. The Xstrata laboratory again reported to Hemenway that the slag contained no payable gold, with a result of only 0.55 g/mt (approximately 220 times less gold than the amount reported by Ledoux). *Id.* ¶ 52.

In addition to acknowledging the vast discrepancies in the results of its own tests and those provided by ART, Xstrata also admits that the initial 80 pounds of Gorham slag picked up by Delia from the top of the pile while at the site visit in May of 2006 did not constitute a "representative sample" of the slag, *id.* ¶ 32, and that a sample consisting of one or two pieces of slag would not ever create a "representative sample" of the Gorham slag. *Id.* ¶ 33. However, Xstrata disregarded the results of their own tests of two pieces of the Gorham slag in June of 2006 because "[i]n telephone calls Delia assured both Jay Hemenway and Ian Parkinson that there was payable gold in the slag, but that there needed to be a bigger sample taken to show the true amount of gold." *Id.* ¶¶ 34, 51-52.

*Subsequent Testing and Shipments of the Slag*

Between June 27, 2006 and July 18, 2006, ART took delivery of the approximate 2,000 tons of slag from the Gorham site at its facility in Chambersburg, Pennsylvania.  *Id.* ¶ 53. During the initial phases delivery, as each truck was received at the ART facility it was dumped outside the building on a concrete staging area, and then the slag was moved into the building using bucket loaders.  As each truck was unloaded, a random sampling of a 55 gallon drum of material was collected, labeled and set aside by Carl Leffler and Jeff Raynor, ART employees. *Id.* ¶ 55.   In addition, Leffler used a handheld X-ray device on five pieces of the slag randomly selected from each 55 gallon drum in order to ensure that, in general, the material composition of the slag was fairly uniform.  The readings for the precious metal content varied significantly, however.  *Id.* ¶ 62.  The X-ray was not used to ascertain the exact precious metal content of the pieces.  *Id.* ¶¶ 58-59.

After 17 truckloads had been processed in that manner (approximately a quarter of the total ultimate shipments), Leffler and Raynor dumped the 55 gallon drums they had collected to that point into one pile, then coned and quartered the material, and created a single 55 gallon drum of material weighing approximately 873 pounds.  *Id.* ¶ 56.  During this part of the process, Leffler and Raynor did not use the handheld X-ray device.  *Id.* ¶ 59.  Thus, as Xstrata concedes, the readings for gold content played no factor in which pieces of slag ultimately made their way into the final 55 gallon drum that was sent to for testing.  *Id.* ¶ 63.

On July 7, 2006, while the 55 gallon drums were being processed, Delia spoke to Hemenway to apprise him of what they were doing.  Hemenway memorialized the conversation in an email to Parkinson the same day that states, in pertinent part, the following:

"Just got off the phone with Tom."

"They have 1,000 mt on the ground there and have fully sampled 500 mt of it (a 55 gal drum per truck load).  They are grinding the sample (1000 lb AFTER cone & quartering) next week and will send us a portion for evaluation."

"I also told him that if he was going to all of this trouble to sample, we could get a rep to observe and do the sampling there.  *This stuff will need some pretty serious sampling*.  Tom was fine with the idea.  They still have quite a bit to receive, but it's coming soon."

"We really need to spend some time on Monday."

*Id.* ¶ 66 (emphasis added).  Parkinson responded that Xstrata should take a trip to Chambersburg to observe the slag and the sampling. He stated, "[l]et's talk and plan a trip to his plant."  *Id.* ¶ 67.

Ultimately, however, Xstrata did not send a representative to observe the delivery of the slag to ART's facility, and never took a trip to the Chambersburg plant to observe the slag before signing the contract.  *Id.* ¶ 68.  When asked about this July 7, 2006 email at his deposition, Hemenway testified as follows:

> Q. Let's go down to the next to last paragraph of the same email we're looking at. It says, "I also told him that if he was going to all of this trouble to sample, we could get a rep to observe and do the sampling there."  Did I read that correctly?
>
> A. That's correct.
>
> Q. What did you mean by that sentence?
>
> A. Well, when Tom said that he had a thousand tons on the ground and had already fully sampled 500 metric tons of it, that there was still more sampling to be done, and I suggested maybe we could have a rep to observe that sampling.
>
> Q. And did you ever enlist the services of a rep to observe the sampling?
>
> A. We were never able to.
>
> Q. Why is that?
>
> A. Because either we – I don't know why we didn't.

7

*Id.* ¶ 69.

Thus, as of July 10, 2006, ART had attempted to sample one-quarter of the slag material as they had received it. However, Xstrata knew that the remaining three-quarters of the material representing approximately 3,000,000 pounds of slag, had yet to be sampled or tested by anybody.  *Id.* ¶ 70.  As described above, to the extent the drum that was sent for testing was a "representative sample," it was not a representative sample of the entire 2,000 tons of slag, but rather of the first one-quarter of the slag received by ART, because, obviously, each individual piece of slag from the whole pile did *not* have at least the opportunity to be randomly selected, *id.* ¶ 28, and Xstrata was made aware of this fact.  *Id.* ¶ 72.

On July 10, 2006, ART shipped the 873 pound single 55 gallon drum it had culled from the first one-quarter of the slag it had received to Metallix, a precious metal refining company in Greenville, North Carolina for processing.  Metallix milled the slag down to a coarse powder of 40 mesh, and a fine powder of 100 mesh.  The powders were then fire assayed by both Metallix and Ledoux.  *Id.* ¶ 71.  The remaining slag was never sampled or tested by Xstrata or ART until Xstrata signed contract and ordered the trial shipment.  *Id.* ¶ 73.

The results of the fire assays were reported to ART via fax from Metallix.  The results showed that as a whole, the slag had 51 g/mt as determined by Metallix, and 41 g/mt as determined by Ledoux.  *Id.* ¶ 79.  The parties dispute the results.  Delia asserts that Metallix "made a significant error" in preparing the final results by failing to include the fire assay of the coarse powder.  *Id.* ¶ 77.  Delia argues that had Metallix not made the error, it would have reported a combined 43 g/mt, instead of the 51 g/mt it reported to Xstrata.  *Id.* ¶ 80.  Xstrata asserts that there was no error, that Delia knew Metallix was reporting four different results for

gold content and reported only the highest result to Xstrata. *Id.* ¶ 77. On August 18, 2006, Delia advised Xstrata by email of the Metallix results. *Id.* ¶ 81.

### *The Trial Shipment and the Execution of the Contract*

On September 19, 2006, Jay Hemenway apprised fellow Xstrata employee Thomas Schnull of the existence of the proposed ART transaction via email, describing the transaction as an "IMPORTANT PROJECT." *Id.* ¶ 83 (emphasis in original). On October 27, 2006, Hemenway sent an email to Delia requesting that the trial shipment, as referenced in the draft contract, occur as soon as possible. *Id.* ¶ 87. October 30, 2006, Hemenway sent an email to Schnull with changes to be incorporated into the contract. *Id.* ¶ 88.

On November 7, 2006, the contract was signed by Delia on behalf of ART, and Schnull on behalf of Xstrata. *Id.* ¶ 91. The contract as signed was drafted Schnull and Hemenway of Xstrata. *Id.* ¶ 92. As of the signing of the contract on November 7, the only two fire assays that Xstrata conducted itself showed that the Gorham slag had absolutely no payable amounts of gold. *Id.* ¶ 93. Moreover, the contract makes no reference to the results of the Metallix assay. *Id.* ¶ 94.

The signed contract specifically provided that ART would deliver a "trial" shipment of the slag to Xstrata and that the agreement would be subject to approval by Xstrata of that shipment:

> "Agreement shall be subject to approval by Falconbridge of a 22-44 wmt trial shipment during the 4th quarter of 2006 based on Falconbridge's analysis and approval of a representative sample of the material. Analysis shall confirm indicated metals values and minor elements."

*Id.* ¶ 96. The parties dispute the purpose of the trial shipment. Delia cites to the deposition testimony of both Schnull and Hemenway—the two individuals who drafted the agreement—indicating that the purpose of the trial shipment was to confirm the

indicated metal values.  *Id.*  ¶¶ 97-98.  Xstrata, while not contesting the accuracy of the quoted portions of the depositions, argues that the "biggest reason why Xstrata required the … trial [shipment] lot was to make sure that the material was crushable, since it had to be crushed before processing in the plant."  *Id.* ¶¶ 96-97.

As relevant to this appeal, the contract also provided for independent sampling of the material by a mutually agreed-upon third party—in this case, SGS Canada ("SGS")— as well as the right of each party to conduct its own testing of samples to be assembled by SGS.  Bankr. Doc. 53-7 at 1.   The contract also spelled out a procedure for settling disputes concerning the gold content of individual shipments.  *Id*. at 1-2.  Finally, the contract provided for a "provisional payment" of 80% of the anticipated value of the precious metal content in the material to be made within 15 days of delivery of each shipment, and for "full settlement" to be made 15 days after the "quotational period," which was defined as the second month after the month of delivery.  *Id.* at 2.

After the contract was executed,[3] Xstrata ordered delivery of the trial shipment from ART's facility in Chambersburg, Pennsylvania, to its smelter facility in Belledune, Nova Scotia.  Bankr. Doc. ¶ 99.  On November 20, 2006, the trial shipment containing approximately 72 tons of metallic slag arrived at the Belledune smelter via two B-train trucks from ART.  *Id.* ¶ 100.  Upon receipt of the trial shipment, the Xstrata laboratory dried, crushed, milled and screened a preparation of the material to create a representative sample of eight 200 mg bags of 100 mesh (fine powder) powder for testing. This process

---

[3] Delia asserts that, at the time of the execution of the contract, Xstrata had a formal, written due diligence protocol in place for the purchase of the type of material at issue here and failed to comply with it.  Bankr. Doc. 52 ¶ 43. Xstrata denies the existence of a formal protocol.  *Id.*  For purposes of this opinion, the Court does not assume that Xstrata had a formal protocol, or that it failed to comply with any informal protocol that it may have had in place.

was completed, and the sample was available for testing, on December 7, 2006. *Id.* ¶¶ 102-103. The testing did not take place, however, until February of 2007.

<u>*Delivery of the Remaining Slag and the Testing of the Samples*</u>

Notwithstanding that the testing of the trial shipment had not been done, Xstrata ordered delivery of the remaining 2,000 tons of slag, which delivery was to be conducted in three separate train shipments, each consisting of seven loaded railcars, in December 2006. *Id.* ¶ 109. ART and Xstrata mutually retained the services of SGS, a global sampling and testing company, to perform the representative sampling of the materials as the railcar shipments were loaded at ARTs facility in Chambersburg. *Id.* ¶110.

The first railcar shipment left Chambersburg on or about December 13, 2006. *Id.* ¶ 111. SGS prepared the sample for the first railcar shipment and sent it to the SGS facility in Lakefield, Ontario, Canada where it was processed and ultimately milled down to a fine 100 mesh powder. Sealed sample splits where then delivered to laboratories previously agreed upon by the parties for X-ray scanning and fire assaying. *Id.* ¶ 112. ART hired SGS to do the X-ray scanning and fire assaying of its sample split. Xstrata opted to use its own laboratory at the Belledune Smelter to do the testing of its sample split.[4] *Id.* ¶ 113.

On January 3, 2007, SGS sent the prepared sample split from the first railcar shipment to the Xstrata laboratory at the Belledune smelter via overnight courier. *Id.* ¶ 116. Thus, the Xstrata laboratory had its sample split for the first set of railcar shipments available for testing on or about January 4, 2007. *Id.* ¶ 117.

---

[4] Xstrata has its own metallurgical laboratory, its own sampling department, and its own processing department, in addition to its own smelter all on the campus where the slag was delivered. *Id.* ¶ 141.

On January 4, 2007, Xstrata received the delivery of the first of three train shipments at Belledune, and the second on January 22. *Id.* ¶¶ 118, 120. On February 1, 2007, Xstrata issued a check to ART in the amount of $350,826.64 as the "provisional payment" on the first railcar shipment. *Id.* ¶ 121. The check was issued to ART despite the fact that the in-house Xstrata laboratory had not yet conducted an assay on the trial shipment sample, which was received in the laboratory on December 7, 2006, or the first railcar shipment sample, which was received in the laboratory on January 4, 2007. *Id.* ¶ 122.

On February 8, 2007, Xstrata issued a check to ART in the amount of $477, 301. 49 as the "provisional payment" on the second railcar shipment, despite the fact that the in-house Xstrata laboratory had not yet conducted an assay on the trial shipment sample, received in the lab December 7, 2006, or the first railcar shipment sample, received in the lab January 4, 2007. *Id.* ¶ 125.

Testing of the trial shipment that had been delivered on November 20, 2006 was finally begun on February 14, 2007. *Id.* ¶ 105. On February 20, 2007, the Xstrata laboratory completed the three-day fire assay of the trial shipment. *Id.* ¶ 106. On March 1, 2007, the Xstrata laboratory issued a Certificate of Analysis that erroneously concluded that the gold content of the slag from the trial shipment was 130 g/mt. *Id.* ¶ 107. Xstrata now admits that the trial shipment slag material actually no payable amount of gold. *Id.* ¶ 108.

On February 22, 2007, the Xstrata laboratory commenced the three day process of conducting a fire assay on the prepared samples for the first and second railcar

shipments.[5]  *Id.* ¶¶ 131, 133.  On March 2, 2007, the laboratory advised Hemenway via email that the results of the first and second railcar shipments showed no payable amount of gold.  *Id.* ¶¶ 132, 134.  Thus, as of March 2, 2007, Jay Hemenway admitted that he was expressly provided with the results of the assaying for the first and second railcar shipments, and that the assaying showed no payable amount of gold in either of the 700-800 ton shipments.  *Id.* ¶ 135.

On February 27, 2007, Xstrata received the delivery of the third railcar shipment at Belledune.  *Id.* ¶ 136.  On March 12, 2007, Xstrata initiated a wire transfer to ART in the amount of $332,511.20 as the provisional payment on the third railcar shipment.  *Id.* ¶ 137.

Prior to Xstrata making payment for each of the three railcar shipments, it had each of the entire lots of slag delivered to and sitting at its smelter campus in Belledune.  *Id.* ¶ 140.  Xstrata has its own sampling department, its own processing department, its own metallurgical laboratory, and its own smelter all on the campus where the slag was delivered.  *Id.* ¶ 141.

On May 5, 2007, for the first time, Xstrata and ART agreed to exchange the trial shipment assay results on the dates May 7 and May 8, 2007, though after receiving Xstrata's result, Delia sent a letter telling Xstrata that he accepted Xstrata's assay and did not provide one from ART.  *Id.* ¶ 146.  On June 11, 2007, Hemenway sent an email in which he stated "we have a problem with Advanced Recycling. The gold assays that we

---

[5] In the the Responses to Delia's Statement of Uncontested Material Facts and Xstrata's Additional Material Facts, Bankr. Doc. 52, the parties also agreed that Xstrata laboratory fire assay results for samples taken from both the first and second railcar shipments were completed and reported to Hemenway at some point between February 17 and February 20, 2006.  *Id.* ¶¶ 123, 126.  The parties provide no explanation for this apparent inconsistency.

have for their material are much lower than the trial shipment (2 b-trains in November).

Is apparent from the assays that the two materials are different (not just gold)." *Id.* ¶ 149.

## II.     Discussion

### A.  Standard of Review of Bankruptcy Court Judgments

This Court has jurisdiction to hear appeals from decisions of a bankruptcy court pursuant

to 28 U.S.C. § 158(a), which provides in relevant part that "[t]he district courts of the United

States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees; . . .

[and,] with leave of court, from other interlocutory orders and decrees . . . of bankruptcy judges."

28 U.S.C. § 158(a).  A district court generally reviews the findings of fact of a bankruptcy court

under a "clearly erroneous" standard, see Fed. R. Bankr. P. 8013, but conclusions of law are

reviewed *de novo*.  *See, e.g., Shugrue v. Air Line Pilots Assoc. Int'l (In re Ionosphere Clubs,*

*Inc.)*, 922 F.2d 984, 988 (2d Cir. 1990); *Nova v. Premier Operations (In re Premier Operations),*

294 B.R. 213, 217 (S.D.N.Y. 2003).  A bankruptcy court's decision to grant summary judgment

is reviewed *de novo* because the existence of issues of material fact is a question of law.  *In re*

*Enron North American Corp.*, 312 B.R. 27, 28-29 (S.D.N.Y. 2004); *Jacobowitz v. Cadle Co. (In*

*re Jacobowitz)*, 309 B.R. 429, 435 (S.D.N.Y. 2004); *Hanover Direct, Inc. v. T.R. Acquisition*

*Corp. (In re T.R. Acquisition Corp.)*, 309 B.R. 830, 835 (S.D.N.Y. 2003).  As relevant to this

appeal, contract interpretation, in particular, is generally a matter of law, subject to *de novo*

review.  *United States v. Barrow*, 400 F.3d 109, 117 (2d Cir. 2005); *Nowak v. Ironworkers Local*

*6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir.1996) ("[W]hether a written contract is ambiguous

is a question of law for the trial court whose determinations will be reviewed *de novo*"); *cf. In re*

*Ionosphere Clubs, Inc.*, 922 F.2d at 988 ("This court exercises the same review over the district

court's decision that the district court may exercise [over the bankruptcy court's decision].") (citation omitted).

<u>*Standard of Review for Summary Judgment Motions*</u>

Summary judgment is only appropriate where the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, [and] other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), 56(c). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Osberg v. Foot Locker, Inc.*, 907 F. Supp. 2d 527, 532 (S.D.N.Y. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322-23); *see also* Fed. R. Civ. P. 56(c)(1)(B). The burden then shifts to the non-moving party to come forward with admissible evidence sufficient to support each essential element of the claim, and "designate specific facts showing that there is a genuine

issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted); *see also Cordiano*, 575 F.3d at 204.

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). A motion for summary judgment cannot be defeated on the basis of conclusory assertions, mere denials or unsupported alternative explanations of facts. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) (collecting cases); *see also Senno*, 812 F. Supp. 2d at 467 (citing *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). The non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'" *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), it "must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson*, 477 U.S. at 256-57). "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" *McClellan*, 439 F.3d at 144 (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).

"Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Abramson v. Pataki*, 278 F.3d 93, 101

(2d Cir. 2002) (quoting *Celotex Corp.*, 477 U.S. at 322).   In that situation, there can be no "genuine dispute as to any material fact," since a failure of proof on an essential element of the non-moving party's case "necessarily renders all other facts immaterial."   *Celotex Corp.*, 477 U.S. at 322-23.

### B.  Xstrata's Reliance on Delia's Misrepresentations was not Justifiable

Xstrata's causes of action are premised on violations of Section 523 of the Bankruptcy Code (the "Code"), Complaint at 1, which generally governs exceptions to discharge under the Code.  These statutory provisions "reflect a congressional decision to exclude from the general policy of discharge certain categories of debts." *Grogan v. Garner*, 498 U.S. 279, 287 (1991).  A court must construe these exceptions liberally in the debtor's favor. *See Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998); *Nat'l Union Fire Ins. Co. v. Bonnanzio (In re Bonnanzio)*, 91 F.3d 296, 300 (2d Cir. 1996) (in view of the "fresh start" policy of the Bankruptcy Code, exceptions to the dischargeability of debts should be narrowly construed in favor of a debtor); *State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996).  The narrowness of the inquiry and the kinds of debts to be denied discharge "suggest that the exceptions to discharge should be limited to dishonest debtors seeking to abuse the bankruptcy system in order to evade the consequences of their misconduct." *Sherman v. SEC (In re Sherman)*, 658 F.3d 1009, 1016 (9th Cir. 2011); *In re Lew*, Bankr. No. 11-10346 (ALG), 2011 WL 5836481, *3 (Bankr. S.D.N.Y. Nov. 21, 2011).  Nondischargeability under § 523 must be proven by the plaintiff by a preponderance of the evidence. *Grogan*, 498 U.S. at 291; *Lubit v. Chase (In re Chase)*, 372 B.R. 125, 128 (Bankr. S.D.N.Y. 2007) (plaintiff has the burden of demonstrating nondischargeability under any of the three causes of action in § 523 by a preponderance).

Section 523(a)(2)(A) of the Code, on which Xstrata primarily relies,[6] excepts from a bankruptcy discharge any debt "obtained by . . . false pretenses, a false representation, or actual fraud. . . ." 11 U.S.C. § 523(a)(2)(A). The three alternative bases of nondischargeability under § 523(a)(2)(A), although grouped together and frequently conflated, represent different concepts. *In re Chase*, 372 B.R. at 128. To establish "false pretenses," a plaintiff must show either conduct or an implied misrepresentation by the debtor that was intended to defraud a creditor into turning over money or property. *In re Dobrayel*, 287 B.R. at 12. "In effect, a false pretense is designed to convey an impression without an oral representation." *In re Chase* 372 B.R. at 128 (citing *Wings v. Hoover (In re Hoover)*, 232 B.R. 695, 700 (Bankr. S.D. Ohio 1999)). Here, Xstrata does not rely on any implied misrepresentations by Delia or conduct by him that fostered a false or misleading impression. Rather, Xstrata relies on Delia's oral and written representations that the slag contained payable gold. See Appellant's Br. at 22, n.17 ("[M]ost of Delia's fraud consists of affirmative misrepresentations, not fraudulent concealment[.]") Such allegations thus do not come within the "false pretenses" prong and are actionable, if at all, under the "false

---

[6] In its opening brief, Xstrata asserts that "also present here" are violations of 11 U.S.C. § 523 (a)(4), which pertains to fraud or defalcation committed by a fiduciary, embezzlement, or larceny; and 11 U.S.C. § 523 (a)(6), which pertains to willful or malicious injury by the debtor to another entity or the property of another entity. Brief of Appellant Xstrata Canada Corporation ("Appellant's Br.") at 10, Doc. 6. However, Xstrata does not explicitly address either of those provisions in its submissions. Accordingly, in light of the failure of parties to address the issues, the Court does not disturb the bankruptcy court's findings in this regard. The Court notes, moreover, that the record presented does not appear to support a claim under either theory. In the first instance, there is no evidence that there existed a fiduciary relationship between Xstrata and Delia. *See, e.g.*, *Sandak v. Dobrayel (In re Dobrayel)*, 287 B.R. 3, 14 (Bankr. S.D.N.Y. 2002) (citing *LSP Inv. Partnership v. Bennett (In re Bennett)*, 989 F.2d 779, 784 (5th Cir. 1993) for the proposition that the concept of fiduciary under Section 523(a)(4) is narrowly construed and applies only to technical or express trusts and not to those which law implies from contract); *see also Owens v. Owens*, 155 Fed. App'x. 42 (2d Cir. 2005) (the relationship required under § 523(a)(4) must have existed before the act that created the debt). The Court also cannot conclude that Delia acted with actual intent to cause Xstrata injury so as to trigger an exception to discharge under § 523(a)(6), particularly in light of the unfettered access Xstrata had to the slag. *See Kawaauhau*, 523 U.S. at 61 (as used in that section, the word "willful" indicates "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury"); *see also In re Stelluti*, 94 F.3d 84, 87 (2d Cir. 1996) (The injury caused by the debtor must also be malicious, meaning "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will.").

representation" and "actual fraud" prongs of § 523(a)(A)(2).  *In re Chase*, 372 B.R. at 129.
Because these two latter prongs share a common and, on the facts of this case, dispositive,
element, they will be discussed together.

Proving a "false representation" requires evidence of a false or misleading statement
made with intent to defraud.  *Id.*; *In re Dobrayel*, 287 B.R. at 12.  The plaintiff must also
establish justifiable reliance.  *See In re Gonzalez* 241 B.R. 67, 71 (S.D.N.Y. 1999) ("To exempt a
debt from discharge under Section 523(a)(2)(A), the non-debtor's reliance must be 'justifiable'
under the circumstances") (citing *Field v. Mans*, 516 U.S. 59 (1995)).  Proof of "actual fraud"
rests on the "five fingers of fraud," that is, proof that the debtor (1) made a false representation
(2) while knowing it was false (3) with the intent to deceive the creditor; plus the creditor (4)
justifiably relied on the misrepresentation; and (5) suffered pecuniary damages as a result.  *Field*,
516 U.S. at 70–71 (holding that the definition of fraud in the Restatement (Second) of Torts
(1976) governs § 523(a)(2)(A)).

The dispositive issue in this case is whether Xstrata justifiably relied on Delia's
misrepresentations.  It was Xstrata's burden to prove justification by a preponderance of the
evidence.  The bankruptcy court determined that it had not carried its burden.  This Court agrees.

In discussing what constitutes "justifiable reliance" for purposes of § 523(a)(2)(A), the
Supreme Court stated:

> Although the plaintiff's reliance on the misrepresentation must be justifiable . . .
> this does not mean that his conduct must conform to the standard of the
> reasonable man.  Justification is a matter of the qualities and characteristics of the
> particular plaintiff, and the circumstances of the particular case, rather than the
> application of a community standard of conduct to all cases.  Justifiability is not
> without some limits, however. . . . *[A] person is required to use his senses, and
> cannot recover if he blindly relies upon a misrepresentation the falsity of which
> would be patent to him if he had utilized his opportunity to make a cursory
> examination or investigation*.

*Field*, 516 U.S. at 70–71 (emphasis added) (citations and quotations omitted).  On the facts of this case, the bankruptcy court's conclusion that Xstrata's reliance on Delia's misrepresentations was not justified was more than amply supported.

At the outset, it bears emphasizing that, by any standard, this was a substantial transaction; it involved 4,000,000 pounds of material for which Xstrata ultimately paid in excess of $1 million.  Xstrata is a sophisticated, international corporation that is in the business of mining, smelting, and refining metals, including precious metals—i.e., the substance of the underlying transaction is what Xstrata does for a living.  Xstrata acknowledged that this was an "important project" and that, given the nature of the material involved, it would require some "serious sampling."  Bankr. Doc. 52 ¶ 66.  Xstrata also admits that it had the capability at its facility in Nova Scotia to process, sample and test the material that it received.  Indeed, when choosing a laboratory to conduct testing on behalf of Xstrata in the event of a dispute concerning the amount of payable gold in the slag, Xstrata chose *itself*.  Its laboratory early and accurately reported that the two pieces of slag that Delia provided prior to signing any agreement contained no payable gold.  For three months prior to making any payments, Xstrata had actual, exclusive possession of a substantial portion of the slag that was provided, *at least in part*, so that Xstrata could confirm for itself the amount of gold it contained.  Yet, it failed to test the material prior to paying.  Moreover, there is no indication in the record that Xstrata had previously had any substantial business dealings with Delia—much less a track record with him—such that it might have been justified in relying on Delia's word that there was gold in the slag, or acceding to Delia's requests to make payment promptly, as a company might do for a favored customer.[7]  In light of the foregoing, even when construing the facts in the light most favorable to Xstrata and

---

[7] Only one prior transaction is referenced; a 2005 transaction involving not precious metals, but rather crushed cathode ray tube glass that ART had obtained and contracted with Xstrata to process.  Bankr. Doc. 53-8 (Affidavit of Jay Hemenway ¶ 3).

resolving all ambiguities and drawing all reasonable inferences against Delia, Xstrata's reliance in this case was not justified as a matter of law.

Xstrata asserts that Delia's scheme was fraudulent from the very outset of this transaction in that he knew before he ever went to the Gorham facility that testing showed there was no payable gold in the slag.  Even assuming Delia cherry-picked the initial 80-pound grab sample with the use of an X-ray, Xstrata admits that it was aware that the Gorham slag was heterogeneous in nature and would require sophisticated sampling in order to determine the actual potential gold content.  Moreover, it admits that the procedure Delia employed to collect the 80 pounds could never constitute a representative sample.  Bankr. Doc. 52 ¶¶ 32-33.  Thus, it cannot assert that it reasonably relied on Delia's misrepresentations concerning the initial grab sample.

By early July, Xstrata had completed its own testing of two pieces of slag that Delia had provided from that very same cherry-picked grab sample, which results showed no payable gold. *Id*.  ¶¶ 51-52.  Xstrata "disregarded" those results and pushed forward with the transaction because Delia—who had never engaged in a precious metals transaction with Xstrata—"assured" both Hemenway and Parkinson in telephone calls that there was payable gold in the slag.  *Id.* ¶¶ 34, 51-52.  Thereafter, as Delia was preparing a sample of the first 25% of the slag he received, he described the process he was employing and told Xstrata that he was "fine" with a representative from the company going to his facility to do their own sampling there.  Xstrata acknowledged that the material would need some "pretty serious sampling," but passed up the opportunity to go to Delia's facility or to do its own sampling.  *Id.* ¶¶ 66, 69.

According to Xstrata, Delia subsequently sent it only so much of the Metallix test results of that sample that showed payable gold and concealed the balance of the results.  But it was

Xstrata that drafted the contract that was executed in November 7, 2006, and the contract specifically provided for the delivery of a "trial shipment" which would be subject to testing by Xstrata to confirm the "indicated metal values." *Id.* ¶¶ 96-98. Xstrata received the shipment on November 20, 2006, and had a processed sample in its laboratory and available for testing as early as December 7, 2006. Again, Xstrata did nothing.

On January 4, 2007, Xstrata received delivery of the first of the three train shipments at Belledune, which it paid for on February 1, despite the fact that it had at that point conducted no testing of the trial shipment or the sample split for that shipment. On January 22, Xstrata received delivery of the second of the three train shipments, which it paid for on February 8, and again before it had conducted any testing on the samples it had previously been provided. By no later than March 2, 2007, Xstrata's own testing of the first two shipments showed no payable gold. *Id.* ¶ 135. Notwithstanding those results, on March 12, 2007, Xstrata paid for the third train shipment, which it had received on February 27. *Id.* ¶ 137. Thus, as specifically admitted by Xstrata, *prior* to paying for any of the three individual shipments, it had the entirety of the shipment for which payment was made sitting at its facility at Belledune. *Id.* ¶ 140-41.

On these facts, the relevant caselaw compels a finding that Xstrata was not entitled to rely on Delia's misrepresentations. Simply stated, Xstrata had exclusive and unfettered access to the slag, and had as well the expertise and the wherewithal to examine it. It therefore failed to conduct the testing prior to paying solely at its peril. As the Supreme Court, the Second Circuit and the New York Court of Appeals have found, such access precludes a claim of reliance on misrepresentations. *See Shappirio v. Goldberg*, 192 U.S. 232, 241–42 (1904) ("When the means of knowledge are open and at hand, or furnished to the purchaser or his agent, and no effort is made to prevent the party from using them, and especially where the purchaser undertakes

22

examination for himself, he will not be heard to say that he has been deceived to his injury by the misrepresentations of the vendor."); *Grumman Allied Indus. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984) ("Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance."); *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 123 (2d Cir. 1984) (the principle that access bars claims of reliance on misrepresentations has been expressly recognized by the Second Circuit); *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 322, 157 N.E.2d 597, 599 (N.Y. 1959) ("[I]f the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentation.") (citation omitted).

The "principle embodied in these precedents is that '[w]here the representation relates to matters that are not peculiarly within the other party's knowledge and both parties have available the means of ascertaining the truth, New York courts have held that the complaining party should have discovered the facts and that any reliance under such circumstances therefore would be unjustifiable.'" *Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1016 (2d Cir. 1989); *see also Compania Sud-Americana de Vapores v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 419-20 (S.D.N.Y. 1992) ("In this case, there is no basis to dispute that [plaintiff] had access to the critical information underlying its fraud claim and, had it exercised ordinary intelligence or made simple inquiries, [it] would have been able to discover the alleged misrepresentations."); *Most v. Monti,* 91 A.D.2d 606, 456 N.Y.S.2d 427, 428 (N.Y. App. Div.

1982) ("It is clear that [the] information ... was readily available to plaintiffs upon their making reasonable inquiry.").

The Court's holding is buttressed by the Supreme Court's observation in *Field* that "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Field*, 516 U.S. at 70–72. Here, a sophisticated corporate entity with expertise in the field engaged in a substantial transaction with an individual with whom it had not done this type of business in the past. Xstrata appreciated that the material at issue would require sophisticated sampling, yet, did not ensure that such sampling was done before it took possession, nor did it heed the results of its own laboratory finding that no payable gold was in the two pieces of slag provided by Delia. Xstrata's response is simply to assert that Delia orally "assured" them that the stuff had gold. That is not enough. *See Most v. Monti*, *supra*, (summary judgment proper where an experienced businessman claimed he justifiably relied on a mere verbal assurance, prompting him to incur a substantial financial obligation).

Xstrata's efforts to distinguish *Grumman Allied Indus. v. Rohr Indus., Inc.*, 748 F.2d 729 (2d Cir. 1984), on which the bankruptcy court principally relied, are unavailing. To summarize briefly, that case involved the purchase by Grumman for $55 million the assets of a company that manufactured buses. The purchase included two prototypes of a new bus model for which testing had not been completed when the transaction closed. After the sale, and after Grumman sold several thousand of the new models, structural defects arose and the buses had to be removed from operation. Grumman then sued Rohr, alleging that Rohr had made affirmative misrepresentations and concealed material facts concerning tests conducted on the new model. 748 F.2d at 730. The Second Circuit affirmed the district court's grant of summary judgment to

Rohr "because Grumman contractually disclaimed reliance upon the representations at issue and enjoyed absolute access to all relevant information necessary to confirm the validity of the representations."   *Id.*   While it is true that the *Grumman* opinion discussed at length the contractual allocation of risk—an issue which is not present here, at least not in same way—the court noted that justifiable reliance on Rohr's fraudulent representations was the "second pillar" of Grumman's argument, and determined that Grumman's "right to unrestricted access and its failure to inquire preclude[d], as a matter of law, its claim of reliance on Rohr's alleged misrepresentations."   *Id.* at 738.   Accordingly, the court determined that Grumman's unjustified reliance constituted a separate and sufficient basis for granting Rohr summary judgment, independent of contract principles:

> Grumman—the allegedly defrauded plaintiff—is a Fortune 500 company, renowned world-wide for its engineering expertise.  The transaction at issue is a $55 million corporate acquisition.  At all stages, Grumman was represented by a sophisticated group of counsel, executives and engineers.  Grumman enjoyed unrestricted access to all the facilities, personnel and records of Rohr, and despite its knowledge that the Model 870 was undergoing endurance testing in late 1977, Grumman neither inquired into the results of that testing, nor asked to scrutinize testing reports.  In light of the unambiguous case law and the undisputed facts, we agree with Judge Mishler that Grumman did not rely solely upon Rohr's representations as to the design and testing of the Model 870.  *If it did, such reliance was plainly unjustifiable given its extensive inquiries and investigations.*

*Id.* (emphasis added).  While *Grumman* was not a bankruptcy case, the Supreme Court has stated that in enacting Section 523 of the Bankruptcy Code, Congress intended to adopt the general common law of Torts.  *Field*, 516 U.S.70-71.  Thus, the lesson of *Grumman* is directly applicable to the instant case.  As the bankruptcy court correctly found, "[Appellant] was in possession and control of what it needed to open its eyes to the lack of gold well in advance of making payment."  Order at 34.

Also unavailing is Xstrata's reliance on *Long Island Savings Bank v. Bigman, et al.*, No. 89 Civ. 0927 (JM), 1991 WL 144224 (E.D.N.Y. Jun. 25, 1991). In that case, the victim bank made loans on admittedly thinly documented mortgage applications in which fraudsters provided false financial information. That case is readily distinguishable because the scheme perpetrated by the defendants was affirmatively structured to prevent the bank from learning the truth of the borrower's actual financial condition. As the court noted:

> As was customary in applications for low doc loans, LISB verified the information contained in the applications by documents and information submitted by the borrower. For example, in verifying the borrower's income, LISB checked the statement against tax returns that were submitted by the borrower. The tax returns were false. In addition, all the applications to LISB contained false information about the borrower's employment. … To verify [the statement that the apartment being purchased was vacant], bank personnel called the appraiser designated by the borrower, i.e., J. Webber or Joseph Webber. The phone number of "Webber" was the office of [defendants] Yakub and Gangaram.

*Id.* at *3. Thus, the bank would have been frustrated in learning the truth even if it were to have made inquiry. It was the pervasive nature of the fraud that drove the court's decision in *Long Island Savings Bank*. The court itself noted that the result would have been different if the bank had had access to the true facts:

> [T]his is not a case where the facts are known to the person claiming to have been deceived. *First Nat. State Bank of New Jersey v. Irving Trust Co.*, 91 A.D.2d 543, 457 N.Y.S.2d 17 (1st Dep't 1982), *aff'd*, 59 N.Y.2d 991, 466 N.Y.S.2d 682 (1983) (because plaintiff had knowledge, no fraud); *Sternberg v. Citicorp Credit Services, Inc.*, 69 A.D.2d 352, 419 N.Y.S.2d 142 (2d Dep't 1979), *aff'd*, 50 N.Y.2d 856, 430 N.Y.S.2d 54 (1980) (no reliance on alleged misrepresentation, so no cause of action for fraud); *200 East End Avenue Corp. v. General Electric Co.*, 5 A.D.2d 415, 172 N.Y.S.2d 409 (1st Dep't 1958), *aff'd*, 6 N.Y.2d 731, 185 N.Y.S.2d 816 (1959) (buyer being fully knowledgeable could not rely on seller's allegedly fraudulent misrepresentations)

*Id.* at *7.  Here, in obvious contrast, Xstrata had full access to the information that would have revealed the truth about the actual gold content in the slag.  "It is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own."  *Field*, 516 U.S. at 71-72 (citing W. Prosser, Law of *72 Torts § 108, p. 718 (4th ed. 1971).

In *Field,* when it established that the fraud exception to discharge requires justifiable, but not reasonable reliance, the Supreme Court, speaking through Justice Souter, acknowledged that it was creating what on the surface would appear to be a less stringent test.  It nonetheless noted that depending on the circumstances and experience of the purported victim, justification would not be a foregone conclusion:  "Naifs may recover, at common law and in bankruptcy, but lots of creditors are not at all naïve.  The subjectiveness of justifiability cuts both ways . . . [.]"  *Field*, 516 U.S. at 76.  On the facts of this case, Justice Souter's observation is prescient.

### C.  The Balance of Xstrata's Arguments Do Not Change the Outcome

<u>*Veil Piercing*</u>

The bankruptcy court determined preliminarily that Xstrata had made no showing that the corporate veil should be pierced.  Order at 17-20.  Because all of the relevant transactions and agreements took place between Xstrata and Delia's company, ART, such a showing was required before Xstrata could reach Delia personally.  While Xstrata is correct that there is no need to pierce the corporate veil to hold corporate officers or employees individually liable for their own acts of fraud, *Der Travel Servs., Inc., v Dream Tours & Adventures, Inc.*, No. 99 Civ. 2231 (HBP), 2005 WL 2848939, *13 (S.D.N.Y. Oct. 28, 2005), it mistakenly argues that the Order below was otherwise based on that determination.  In fact, the bankruptcy court explicitly stated,

after determining that veil piercing was not appropriate, that it would "*assume* that [Delia] could be held personally liable for the debt," and went on to address Appellant's additional arguments. Order at 20 (emphasis added). Thus, the bankruptcy court's determination that Xstrata did not justifiably rely on Delia's fraudulent misrepresentations was not based on, or linked to, its veil piercing analysis. Because this Court agrees with the bankruptcy court's conclusion that Xstrata is not entitled to relief under Section 523 even if it could reach Delia personally, it need not address the veil piercing argument.

### *Interpretation of the Contract*

Xstrata complains that the bankruptcy court improperly determined that it was *required* to test the trial shipment it received in November 2006 prior to taking possession of the balance of the slag. Specifically, Xstrata argues that "the relevant language gives Xstrata the right to receive a test shipment, and, should Xstrata not approve of the shipment, the option to walk away from the agreement." Appellant's Br. at 19. The Court agrees with Xstrata. To be sure, the language of the provision would logically appear to be included in the contract to *protect* Xstrata from being taken advantage of,[8] and Xstrata needn't take advantage of this provision if it didn't think it necessary. Moreover, it would be curious indeed if Delia, having been paid for the slag, could bring a cause of action for breach of contract because Xstrata didn't test the trial shipment. However, this determination does not mean that Xstrata is entitled to relief. Indeed, it only buttresses the Court's conclusion that Xstrata did not rely justifiably on Delia's fraudulent misrepresentations.

In the first place, just because Xstrata wasn't required to test the material does not make the language of the contract irrelevant to the analysis. Xstrata strives mightily to ignore the

---

[8] The specific language is as follows: "Agreement *shall* be subject to approval by [Xstrata] of a … trial shipment during the 4th quarter of 2006 based on [Xstrata]'s analysis and approval of a representative sample of the material. Analysis shall confirm indicated metals values and minor elements." Bankr. Doc. 52 ¶ 96 (emphasis added).

provision by arguing—and doing so exclusively by reference to extrinsic evidence—that the "biggest reason why Xstrata required the B-train trial lot was to make sure that the material was crushable, since it had to be crushed before processing in the plant."  Bankr. Doc. 52 ¶¶ 96-97. One searches the two-page contract in vain, however, for any provision relating to the "crushability" of the slag.  The contract clearly and unambiguously states that the purpose of the trial shipment is to "confirm indicated metals values."  *See Postlewaite v. McGraw-Hill, Inc.*, 411 F.3d 63, 67 (2d Cir. 2005) ("In New York, if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence.") (citation and quotation omitted).  Of course, if we were to look at the extrinsic evidence, the Xstrata employees who actually drafted the agreement would confirm that Xstrata included the provision at least in part to confirm the gold content.  For example, in his deposition Schnull acknowledged that the purpose of the provision was to give Xstrata the flexibility to walk away from the contract after testing the trial shipment.  Bankr. Doc. 46-13 (Schnull Deposition) pp. 40-44.

Secondly, and more to the point, the importance of the provision is not that Xstrata was *required* to test the trial shipment, but rather that it negotiated for itself the *opportunity* to do so. It specifically requested a trial shipment for the very purpose of confirming whether there was gold in the slag.  However, when it received the trial shipment it did nothing, to its substantial detriment.  If it had utilized this opportunity to make a cursory examination or investigation of the slag that was delivered, and of which it had full and exclusive possession, the falsity of Delia's representations would have been patent to Xstrata.  *Field*, 516 U.S. at 70-72.  It is for this reason that Xstrata is wrong to argue that "the parties did *not* allocate to Xstrata the risk that Delia was lying."  Appellant's Brief at 16 (emphasis in original).  That is precisely what the

provision did, though admittedly in a different manner than the contract in *Grumman*.[9]   The requirement of providing the trial shipment can only reasonably be read to provide Xstrata with the opportunity to test Delia's assurances, and to walk away from the transaction if necessary, as Xstrata's employees quite sensibly acknowledged.   Contrary to Xstrata's argument, the protocol put in place by the contract for settling disputes, and the "provisional" nature of the subsequent obligation to pay for shipments as they were delivered, simply does not alter this analysis.

Finally, as discussed above, irrespective of any duty Xstrata may or may not have had pursuant to the contract, dischargeability under § 523(a) imposes an independent duty on a creditor to prove by a preponderance of the evidence that his reliance was justified.   That is why Xstrata is wrong to argue that the bankruptcy court "improperly shifted the risk of loss from an intentional fraudster to a 'negligent' victim."   Appellant's Brief at 20-21.   In the bankruptcy context, it is not enough for Xstrata simply to say that Delia lied and therefore the debt should not be discharged.   This opinion has throughout assumed the fraudulent nature of Delia's misrepresentations.   But that does not end the inquiry—after all, every § 523(a) case deals with a creditor who claims to have been defrauded.   The law requires more, and imposes *on Xstrata* the burden of proving every element that establishes its entitlement to relief by a preponderance of the evidence, including the burden of proving that its reliance was justifiable.   This it has failed to do.

The Court has considered the balance of Xstrata's arguments and finds them to be immaterial to the resolution of the issues presented herein.   *See id.* at 22-25.

---

[9] The contract in *Grumman* was 85 pages long and in it, the parties set forth the representations they had made to each other and disclaimed representations as to specific matters, including a specific acknowledgement that Grumman was not relying on Rohr's representations concerning the testing that was being done on the bus prototypes.   748 F.2d at 731.

### III.   Conclusion

For the reasons set forth above, the Order of the bankruptcy court dismissing Xstrata's complaint is AFFIRMED.   The Clerk of the Court is respectfully directed to docket this decision and close the case.

It is SO ORDERED.

Dated:     September 30, 2013
               New York, New York

                                                    _____
                                                    Edgardo Ramos, U.S.D.J.